Good morning, counsel. Good morning, Your Honor. May it please the Court and counsel, my name is Jai Gohel. I am one of the attorneys, along with my colleague Brian Gerringer, and we represent Plaintiff Insook Kim, who is the mother of the decedent in this case. Your Honors, this is a case in which a suspect was contained, very well contained, within a 10-foot by 12-foot room, posed no immediate threat to any police officers for a period of somewhere between 90 and 101 minutes, had made no effort to do anything to the police officers other than keep them out of the room, and despite that, and was clearly suffering, and the police officers knew, including the defendant's officers, that he was suffering from some form of mental incapacitation, going nuts, had some kind of debilitating mental affectation, that despite that, the officers did not use their training, they did not use the standard procedures that they were to follow in their own department, and under the California Police Officers Standards and Trainings for this type of barricaded suspect, and rather came up with an ad hoc plan without getting their special response team mustered using the appropriate time, talking, and tactics to effectuate a safe arrest, not only for the incredibly unfortunate death of my client's son, but also for the safety of the officers themselves. So what we have is a case in which we are not questioning the tactics of the officers, however, we are suggesting to the court that time was their ally. You've heard it earlier today, it's pretty much a standard known fact that these officers in fact knew that time was their ally in this case. They had at least 88 minutes, if not almost 101 minutes, during which this individual had done nothing. He was within a 10 foot by 12 room with AR-15s pointed at him through a window, he had a police dog, at least two officers outside of the only exit door, and yet these officers chose to initiate a police dog to go into that room, break down the door, break down the door, initiate a police dog to use severe force under the shoe case, which would ultimately provoke this individual that they knew, essentially, was armed with a knife, to cause, ultimately provoke this shooting. There are a few differences between this case and the last case. The last case, the decedent was in his own home. That's correct. This decedent was in someone else's home, and when his friend had tried to go in to talk him out of it, he had cut him, and also, at a prior premises, had cut someone else, so he was a little more of a threat. Your Honor, I would agree that there is no doubt that the conduct of Mr. James was dangerous and certainly criminal up until the point the officers got there. But again, what we have to focus on in the constitutional analysis here is what happened once the police officers got there. Well, but they're not required to disregard everything they know about the subject. That is true. Certainly, they could assess that this individual posed a potential danger. But the standard, in fact, you know, I'd really, I think, start with, in terms of our analysis, I think we're kind of going into the Fourth Amendment analysis, but certainly the most important factor was this individual an immediate threat. The difference between this case and the previous case, in many ways, is that this is a contained suspect. So he is not out in the open wielding a knife. He is in a room where he can't he really can't move. And so they had they had all the information that they could have used. And just like one of the factors that also needs to be considered is what his mental health was. Clearly, it was obvious that he had suffering from some kind of mental incapacitation. They also can look at alternate methods that they have. But I'm not sure which way that cuts in this case, because here he had, seeming without any cause whatsoever, already, what, stabbed two victims that evening. So his mental illness was causing him to be an irrational threat in a way that made him more dangerous, not less dangerous. Well, Your Honor, the police officers on that evening, and that's all that we can look at, not in hindsight, they knew that he had left a party where he had sort of freaked out, jumped through a window, cut one of his friends with a knife. Jumped through two windows. He jumped out one window and into another window. I was getting there, Your Honor. He was he was people were surrounding him. He felt like they were coming at him, so he I'm certain a cut, a knife cut is a knife cut. No one's going to deny that. But he was warding one of the people off, and he cut that person, jumped out of this apartment where the party was, then jumped in. That's true. Jumped into the second house. And then when it and the officers knew that it was when one of the friends went to go try and get him, talk him down. He a good friend. No good deed goes unpunished, I guess. And he then tried to cut this particular individual. But it was not because he was out jumping out trying to get at people. It was always in a manner of retreat. And again, we are conceding that the conduct of Mr. James was dangerous and criminal up until the point the police officers got there. But once the police officers got there, he did nothing, zero, to suggest that he was an immediate threat, which is the second prong of the Graham analysis, which is the most important prong that this Court has held that the Court must consider. I Are you saying that the police, that the police should not have tried to get him from the house where he had broken into the house of someone else? You're saying that the police should not have tried to extract him from that house? Absolutely not, Your Honor. What I'm saying is, what I'm trying to say is that just the mere fact that the police wanted to get Mr. James out of someone else's house, which certainly is a legitimate police purpose, does not mean that they don't use time and tactics, time as their ally, to talk him down, to get a real price to him. They tried that. They tried to talk. He wouldn't respond to anyone that tried to talk with them. Your Honor, that may be true. However, they tried to talk to him with a member of the SWAT team, Officer Fitzgerald, but he was not a crisis negotiator. And in fact, the department policies themselves of this particular department say that in a barricaded situation, suspect situation, especially where the person is armed or potentially armed and assumed to be armed, they should have a crisis, a trained crisis negotiator there to talk to them. But they decided against, they considered that, decided against it. Why is that a violation of his constitutional rights that they considered using that tactic, but decided it was not the preferable one? Because even though, you know, it's easy to criticize the tactics, you have to look at what tactics were used given the immediacy of the threat and the time that they had. They had 90 minutes where he did nothing. I'm just using that as a round figure because it's an easy one. It was about 90 minutes where they knew he had done nothing to anybody, and they had him contained, they had him. But he hadn't come out. That's the problem. That's correct. But, Your Honor, there is a case in which I think it was the Sixth Circuit case, for example, that we cited in our brief, Owalski, where the court, in viewing whether the deliberate indifference standard applied or the purpose to harm standard, there was a 5-hour sort of negotiation standoff in which ultimately resulted in the death of the suspect and, unfortunately, his son. That was the 5 hours, and that was potentially considered not long enough. Well, but that's a different scenario when you have somebody who's barricaded in their own home. You also have to look at everything that happened before. That's the difficulty I have with your argument, is that this isn't someone who just barricaded himself into his home and said, I'm not coming out. This is somebody who's committed crimes and then retreated to another home after committing crimes. So he's a suspect in crimes and not just somebody who's barricaded himself into a home. That's correct. Again, clearly criminal behavior. But once the police officers had him contained, the number one assessment on the Fourth Amendment analysis is, is this person an immediate threat? He was not. Maybe he could potentially be a threat, but he had done nothing during the time the police officers were there, which is the inquiry, the constitutional inquiry, we must, the time frame we must look at. Sure, he's a potential threat. Sure, he is, in fact, and most likely armed. But did he do anything? What about the fact that they could take him into custody for those crimes he had committed? They don't have to wait an immeasurable amount of time to take someone into custody for crimes that have been committed. Your Honor, there actually is case law in the Ninth Circuit which says that just the fact that the police officers need to get their job done, meaning to arrest a suspect who's committed crimes, is not in and of itself enough to justify using in this case excessive force, where they send in a police dog, which is considered under the Chu case, to be severe force for a suspect who is posing no immediate threat. So, you know, one thing I wanted to bring up with the Court, we've been talking a little bit about the excessive force claim under the Fourth Amendment, but the Fourteenth Amendment deprivation of familial relationship claim is equally, if not stronger. In that case, I think it's clear this is the perfect case in which the Court could articulate that you have a situation in which you have plenty of time to deliberate. The officers had, again, about 90 minutes, and, you know, the threshold question on whether or not the deliberate indifference standard is applied in which to measure whether or not the, you know, the shock to conscience test has been met is, was there a reasonable opportunity for these officers to deliberate? Well, here we had 90 minutes. We had a contained suspect with guns trained on him. We had officers who themselves admit, we did everything slow, we thought about everything, yet they come up with this plan ad hoc without using the command structure that they have, the lieutenant, they didn't muster the resources, the incurring personnel and whatnot, and decide to send in simultaneously with less than lethal force, send in a police officer. But we don't set the – I mean, it's not our job to second-guess the strategies that were used by the police, is it? No, Your Honor. But here, this is a case, if you look at the Billington case, if you look at the analysis in Billington, what we have to show is an independent constitutional violation that provokes what might arguably, though we don't concede this, might arguably be a legitimate use of deadly force. Here, the independent constitutional violation was the use of a police canine on an armed, barricaded suspect where you know that the result is going to be, I'm armed with a knife, the officer's had every reason to believe that he was armed with a knife, and in fact, he was, that you send in a police dog, which is trained to bite. One of the officers put on his gloves and knew that this dog was going to bite and there was going to be blood. Send in a dog, it's going to provoke a reaction. So that was the excessive force, sending in the dog with an armed, contained suspect. It was actively resisting arrest, because every time they would try to open the door to access him, he would slam the door back shut with his feet. So he was actively resisting arrest at that point. And when the dog was sent in, it was because there was no other way. They couldn't get him out. But, Your Honor, one must ask oneself respectfully, what was the hurry at this point? I understand that the occupants of that home needed to get back into their home. But this was a man's life that was lost, and a few hours, getting the right personnel there, the governmental interest in doing your job and arresting a suspect is important, but it is not more important than this man's life. There is no question that there were additional strategies that could be used, but that's not the question for us. When we're determining whether or not there's a constitutional violation, things can always be done better. I'm sorry. Forgive me. When they went in after the dog, he leaned toward them, didn't he, with his knife? Well, Your Honor, that's actually a fact that's in dispute. I think at the very least, even if the court didn't find that there was a got a – which it didn't in the district court, that there was a constitutional violation by sending in the dog with an armed, contained, barricaded suspect, there is a dispute of fact as to whether or not he actually did get up. I'll give you an example. There was an officer outside. If you look at the physical evidence, it suggests that he was on his back slightly to the left, which is an impossible position to lunge at the officers, as was suggested by the officers. And in cases where officers, the only people giving evidence about what happened at the moment of the shooting are officers, the court has to look at that very suspiciously. All inferences should be drawn in the favor of, in this case, the nonmoving party. But that testimony you're talking about was immediately before the dog came in. That wasn't at the point when the lethal force was used. That's a – I'm sorry, Your Honor. I didn't mean to interrupt you. Oh, go ahead. The – what I'm saying is there's a material issue of dispute of fact even as to whether this was a bad shooting or not. And so there's physical evidence of the entry and exit of the wounds, which was submitted by – in the record and by our experts. But there's also Officer Lange, who said, my whole reason to exist, I had an AR-15 with the crosshairs pointed at this man's head if he made any move to attack these officers. He never shot. So that is at least enough for, even without a Billington analysis, that that shoot at least raises a material issue of disputed fact. The last thing I want to talk about in terms of questioning tactics, the Davis case says, while we can't necessarily, quote, question tactics in retrospect, you can look at alternative means that were available to officers, especially in a situation where you have such a lengthy period of opportunity to deliberate. I have only about a minute left, so I want to reserve it. But if Your Honor has a question.  Thank you, Your Honor. Good morning, Your Honors. My name is Chris Lustig. I'm counsel for the defendants in Appalese. With me at counsel's table is James Fitzgerald, trial counsel for the same parties. Your Honors, I intended to speak first about appellant's claims that there are disputed issues of fact that the trial court ignored before moving on to the Fourth Amendment and then the Fourteenth Amendment claims. But I do want to quickly respond to just a couple of points that counsel raised regarding the second gram factor and whether or not there was an immediate threat. Mr. James posed an immediate threat to those officers from the time that they were arrested and when they arrived, regardless of the fact that he was closed up in the room, they knew that he had stabbed a person next door. Why does that make him an immediate threat if he's in an enclosed room? Because, Your Honor, he stabbed. Suppose he's in jail, is he still an immediate threat? Well, of course not, Judge. What's the difference? Because at any moment he could open that door, holding the knife, and put other people in danger. His actions up to that point were totally unpredictable. I mean, with a dog and an officer outside, he could open the door and become an immediate danger? He'd still be a danger. Even if they could respond to it, it's still a danger. Well, he would become a danger if he opened the door. Right, Your Honor. That's what makes it immediate. If the door is closed, he's not an immediate danger, is he? It takes a split second to open the door, and he's unpredictable. He's jumped through windows. But they could watch him through the window, whether he's going to get up to open the door. He's lying on his back, right? Yes, Your Honor. And they're observing him lying on his back, and how can he be an immediate danger to open the door if he's lying on his back? Your Honor, he can still open that door within a matter of seconds. But they have warning. They know that, right? They're constantly observing him. Of course. In other words, I think you're stretching the word immediate. Well, by virtue of the fact that he had acted unpredictably, that he had jumped through two closed windows and demonstrated an intent to flee, demonstrated an intent to use a deadly weapon, the fact that he's an immediate danger to open the door, that's how immediate is that danger. In other words, you see, I think your opponent's main line of argument, as far as I can see, is what was the hurry? Why couldn't these officers wait him out? Why did they have to, you know, break down the door and send in the dog? That's, to me, the crucial question. What was the necessity of that? Well, and the second question is, if it wasn't necessary, what makes it a constitutional issue or not a constitutional issue, the choice of tactics? Well, if I understand your Honor's second question correctly, they do need to establish under Billington that it was a constitutional violation, if they're going to attack any of those, any of the police officer's actions before the lethal force was used. And there's no, as the district court correctly found, on the undisputed facts, these officers' actions were unreasonable from the time that they showed up. They give warnings, they tell them that they're police, they give canine announcements. I think you said unreasonable. No. They were reasonable from the time that they showed up. My apologies. Nonetheless, they set up a perimeter. They do take time to try to formulate a plan. They're doing everything correctly up to that point. But the plan they formulated was to, you know, was to attack this isolated, contained, mentally disturbed person. Well, Your Honor, well, I take issue with that. Not to contain him. The question is, well, why couldn't they just contain him and wait it out? Well, there's a couple of responses. First, Your Honor, they were not getting any kind of response from him whatsoever. So they don't know what situation he's in. Well, that's what I said. Why not wait it out? That's not an answer to the question. That's the reason they should wait it out. I don't think so, Your Honor. Well, I have several reasons, but to cut to the chase, they had a visual on him at some point looking into the window. They could see that at this point in time he's lying on the ground. Although he's noncompliant, here is a window of opportunity for them to go in and get him before he rises back up into an agitated state that he demonstrated earlier that evening. Are you kidding? Are you thinking sending in the dog is not going to make him agitated? Well, Your Honor, they were trying to get him away from the door so that they could enter in the door. The thing is, they were trying to agitate him. No, Your Honor. They were using the – they were trying various – Is that what a dog does? I understand. The dog was actually the third or fourth different level of force that they used in this plan. They gave warnings. Then they used the sage to try to move him away from the door so that they could go in the door. When he wouldn't move away from the door, they had to force it open. My question is, why did they have to force it open? Why can't they wait him out? What's the hurry? I mean, that was the question you were pointing at. What was the hurry? My point was that they saw a window of opportunity here where he was potentially vulnerable, that they could go in and get him out safely before he rose up into another agitated state. You mean by ramming the door and sending in the dog? Well, Your Honor, ideally – It's creating a confrontation, isn't it? But Your Honor is second-guessing the tactics as the – But that is creating a confrontation as opposed to waiting him out. My question is, why couldn't they wait him out? What's the reason for that? What's the answer to that question? That's the question you're pointing at. What's the hurry? He's in somebody's house. He's violent and dangerous. Why can't you wait? Well, not while he's contained in the room. That's the question. We've had cases where they wait 8, 10, 12 hours. Well, Your Honor, like I said, they may have had – That's a constitutional matter. Are the police required to work? No. That's my second question. That's the question. Of course not. That's your answer. They have – it is not a constitutional violation. They, the officers, as long as their actions are objectively reasonable, they're entitled to take that course of action. They don't have to wait. There's always going to be alternatives, Your Honor. If the officers had waited 10, 12 hours and he died because of his condition, we'd be back here with another lawsuit that he had been deprived of his medical attention. In fact, the very fact that they're still arguing a deprivation of medical treatment claim undercuts the Fourth Amendment argument, okay, because they're basically saying he should have gotten treatment sooner. Well, what are the officers supposed to do? Break down the door and go in unarmed and try to give him treatment? If the plaintiffs can't decide which way the officers are supposed to go, how are my officers supposed to decide in split-second decisions? Or even – Well, this wasn't split-second. Right. However, use of the dog was, Your Honor, they put in together this plan to try to move him away from the door, and the idea was to get compliance. And if he didn't comply, then they were going to have to force the door open, and then Fitzgerald was going to have to decide whether to use the dog. And that's what he says. He was going to wait. If he's noncompliant, then I'll use the dog. And he was noncompliant. He was kicking back. He was not submitting or surrendering. And so Fitzgerald had to make that call. Now, yes, he was prepared to go one way or the other, and that was part of the plan, but he was objectively reasonable in his decision that once he saw the suspect kicking back, that he could use the dog. And it was not like they sick the dog on somebody who was sleeping or someone who was handcuffed or threw the dog into a jail cell with an inmate. They used the dog in a reasonable way, and they had to act – they had good reason to act when they did, not just because they couldn't wait forever, but because they really saw this as an opportunity for them to resolve the situation safely, because they had a visual on him, because they knew that he had been in a highly agitated and dangerous state earlier that evening, and there was a possibility he'd go back. With respect to the Graham test, however, there are two other factors that the court considers in the government's interest, and that's the severity of the crime at issue. As the court knows, he's stabbed two people, possibly a burglary. He's resisting arrest. The stabbings alone were some of the severest crimes. He's holed up in someone else's house, trespassing. The third factor in the Graham analysis is whether the suspect was actively resisting, and he was. He was – we can use labels to try to describe these things, but what we all know from the facts is he was blocking the door with his body, and he was not complying with orders to come out. He was not complying with requests to show his hands. And then once the officers tried to move in to take custody of him, he fought back physically, and then with a knife. What's your response to opposing counsel's position that there is a material question of fact regarding whether or not he was leaning toward the officers? All the officers, even the officers who are not defendants in this case, all agreed that they saw the decedent lunge toward the two officers in the hallway, Johnson and Fitzgerald. There's really no – there's absolutely no dispute about that or contradiction. What was opposing counsel talking about when he said that one of the – can I finish? When he said that one of the officers outside said he was leaning toward his – on the side? Well, let me try and clarify what I think their position is, and that is they're relying on Officer Lange. Officer Lange was providing lethal cover from one of the windows. And as Your Honor knows, the window was about 12 feet away from the area that the suspect was. It was a dark room. But his job basically was to just hone in on the suspect's head and provide lethal cover in case that knife came out. He never saw the knife. He saw the lunge, but he said later he didn't shoot because he didn't see the knife. And when the officers in their videotaped testimony – I'm sorry, videotaped interviews, if the court watches those interviews, Officer Fitzgerald, Officer Johnson, they all explain that the student was holding the knife like this, like you'd hold an ice pick, okay? And he was holding it in his right hand. And at some point when the – well, when the officers went in, he was more or less on his left side bracing the door with his feet. And Officer Fitzgerald described the lunge at him and Johnson in this overhand way. Fitzgerald and Johnson, neither of them even saw the knife until that last instant. He'd stabbed the dog several times. Fitzgerald didn't even know the dog was stabbed until he was in the hallway. So it's not surprising that Officer Lange, 12 feet away, dark room, didn't see the knife, especially if he's focusing mostly on providing lethal cover to his head. The handle, you'd expect to maybe see the handle up here, but it was down. And that's another point that they make in their argument, is that they had expert witness testimony about the gunshot wounds. Now, Mr. Clark and Mr. Burwell, the experts that supposedly gave testimony saying that the trajectory of the bullets was inconsistent with the officers' description of events, they're not medical experts. They're not medical examiners. They're not forensic pathologists. They're purported to be police procedures experts. So they're not in any position to cast any kind of doubt on the veracity of the officers' statements about whether he was lunging or not based on bullet trajectories. And I don't even think they actually watched the videos, because if they watched the videos, they'd say the way Fitzgerald was describing him, he was coming at an angle that would, common sense-wise, go right to left. So, Your Honors, that's with respect to the Fourth Amendment claim. All three grand factors weigh in favor of the appellees. With respect to the Fourteenth Amendment claim for conscious disregard, if the officers were found to have acted objectively reasonable, there's no way that they could have shocked the conscience. So that claim goes away if the Fourth Amendment claim is upheld. And I would also add that even though they may be evaluated under the deliberate indifference standard for purposes of their decision to make the entry and maybe even to send the dog, this wasn't a situation where they had a lot of time to deliberate. It was still a tense and uncertain situation that they were confronting. And so that's why I think that they're entitled to some kind of there's a middle ground here between deliberate indifference and the intent to harm standard. And this wasn't a situation where they were executing a search warrant and could have done all this planning ahead of time. Or they were, I think some of the other examples were deciding whether or not to hand over Brady material or something like that. They were called to the scene in an emergency situation and that's what they were facing. With that, Your Honor, I will ask the Court to affirm the district court's ruling. All right. Thank you, counsel. One minute rebuttal. Thank you, Your Honors. Just quickly, this case does not we're not asking the Court to set a hard and fast rule about how long police officers have to wait in these kinds of containment, barricaded suspect situations. What we are saying is that time is the police officer's ally and it should be part of both the Fourth Amendment analysis and the deliberate indifference analysis where they have an opportunity to reflect, to deliberate. What is the reason that they had to send this dog in there? We still don't have an answer. There is case law, including the Headwaters case, but they're Your adversary said they saw a moment in time. What is their What's the record bearing on that? I noticed that. There actually was nothing that had changed. Nothing had changed. They saw a window. Well, they had been They'd only actually had visuals on this individual, on Mr. James for five minutes. They had been in the house for some odd, 40-some odd minutes, and they had had a perimeter set up and knew no one else was in the house for over 90 minutes. Nothing had changed. So this window was just an arbitrary moment where they decided they were going to go in with the dog. They, nothing about the behavior of Mr. James had changed at all during that period of time. So when they say that there was this window, this opportunity like Mr. James was digging around, you know, put something in his hand down and was, you know, looking in the closet, if there's some factual change in Mr. James' behavior, there wasn't any. So I believe that this is just, they just decided it was time to go. They had the dogs there, and they were going to go in and try and effectuate this arrest, and they did it on an ad hoc basis. They had time on their side. He was contained, and both under two different standards. The deliberate indifference standard is very different than the Graham standard, but the facts for both are the same, that he was a mentally unstable individual who was fully contained, posed no immediate threat to the officers for upwards of 90 minutes, and he had mental incapacitation, and under both the Graham analysis and the deliberate indifference standard. What about the other Graham factors? The fact that he had committed serious crimes, he was trespassing, and the need to arrest him for it. What about those factors? Your Honor, you're absolutely right. I would suggest that certainly these are serious crimes that he committed. So that factor would weigh against our client. However, the factor with respect to whether or not his – he was actively resisting, I would concede that he was resisting by keeping the officers out, pushing the door back open, but he wasn't attempting to flee. I would say that's a close call, but maybe weighs in the defendant's favor. But the most important – In the defendant's favor? Yes. But the most important factor, the immediate threat, and this Court has held the number one and most important factor is the immediacy of the threat. That weighs immeasurably in Plaintiff's favor. And given that the district court didn't even consider his mental incapacitation, which is another factor, these are three of the articulated factors, but there are other factors, alternative methods available. You can question tactics to the degree that alternative methods are tactics under the Davis v. Las Vegas case. You must consider the mental incapacitation of the individual as an additional factor. So when you take those in addition to the very strong – Well, it wasn't clear – it wasn't clear that there was a – that he was – that there – he did not have a history of mental illness. That's correct. Let's say that. So he could have been affected by a drug. He had taken it. We just don't really know. So it's not clear that he – that there was a mental component to his actions. Your Honor, just quickly, the factual record speaks for itself. Officer Johnson said that our client was – had gone nuts, obviously suffering from some form of mental disorder. And the lieutenant that was called, Lieutenant Cook, who was called, he wasn't even on scene. And it was clear to him that this person was mentally ill or – and so an objective – But having taken a bad drug can manifest those same types of behaviors. So I don't think there was any – in some cases, there is a record of mental instability. Somebody has been diagnosed as schizophrenic or psychotic. We don't have that in this case. There wasn't a clear history or a clear record of mental – of a mental condition. Your Honor, I agree. But if you just look at what the officers knew. They didn't know if he was on drugs or if he was crazy. But he was certainly acting crazy. He was acting – yeah, right. And so that would suggest – this is not the way a person behaves who is – and I would suggest to the court – If they were – if they thought he was on drugs, that would be an argument to wait until the effect of the drug came off. I agree. And I think that – sorry, Your Honor. Yeah. I agree. Although it can be days in some cases before – Well, that's – You just – I mean, it's really easy to second-guess. I understand, Your Honor. That's the point, though. They didn't even have enough information. For example, my client's – excuse me, my client's other son, Howard James, was on scene. He could have informed these officers. He was there at the perimeter saying, that's my brother. If they had waited, they could have gotten so much more information. Hey, Aziz isn't a crazy person, but he has used drugs before. I think he's on drugs. That's what he told the police. What I'm saying is this failure to wait under these circumstances ultimately – and no one is saying that these officers did this on purpose – but it ultimately resulted in the deprivation of my client's life. It's a tough spot. I mean, everybody was in a tough spot in this case. It's very tragic. Thank you, Your Honor. Thank you to both counsel for the argument. The case just argued is submitted for decision by the court. Thank you.
judges: Tashima, Rawlinson, Cjj Rakoff (S. New York), Dj